IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

MARGARET BOAZ,

   Plaintiff,

vs.                                             No. 2:09-cv-2232-dkv

FEDERAL EXPRESS CORPORATION
d/b/a/ FEDERAL EXPRESS and
FEDEX CUSTOMER INFORMATION
SERVICES, INC.,

   Defendants.

_____

FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

     In this employment discrimination lawsuit, the plaintiff,
Margaret Boaz ("Boaz"), claims that the defendants, Federal
Express Corporation d/b/a FedEx Express and FedEx Customer
Information Services, Inc. (collectively "FedEx"), violated two
provisions of the Fair Labor Standards Act ("FLSA"): (1) the
"Minimum Wage" provision, 29 U.S.C. § 206(d) — also known as the
Equal Pay Amendment of the FLSA — which prohibits wage
discrimination between employees on the basis of sex, ("EPA Wage
Discrimination Claim"); and (2) the "Maximum Hours" provision,
29 U.S.C. § 207(a), which requires an employer to compensate an

employee for working more than forty hours per week, ("FLSA Overtime Compensation Claim").[1]

The parties have consented to all proceedings including trial and entry of judgment being conducted by the United States Magistrate Judge pursuant to 28 U.S.C § 636(c). A non-jury trial was held on March 2, 23, 24, and 25, 2015.

At the pretrial conference, the parties identified the following issues for trial:

(1) Whether Boaz performed duties which required same or similar skills, effort, and responsibility, and which were performed under similar working conditions as the duties previously performed by Grade 27 PMA, James Terrell.

(2) Whether any pay disparity between Boaz and Terrell was the result of a factor other than sex.

(3) If any pay disparity between Boaz and Terrell was not a result of a factor other than sex, whether the disparity was caused by negligent or willful conduct on the part of FedEx.

(4) Whether Boaz was properly classified as an exempt employee under the administrative exemption to the Fair Labor Standards Act during all times relevant to her complaint.

(5) If Boaz was not exempt for any relevant period of time, whether she has met her burden of proving that she worked hours which entitled her to overtime compensation under the FLSA.

---

[1]The court previously dismissed Boaz's Title VII retaliation claim and her Tennessee Human Rights Act discrimination claim. (ECF No. 113.) On February 24, 2012, Boaz filed a "Stipulation of Dismissal," voluntarily dismissing her Title VII sex discrimination claim. (ECF No. 146.) Accordingly, the only remaining claims are Boaz's EPA and FLSA claims.

     (6)   If Boaz was not exempt, whether FedEx's failure to pay her overtime compensation was the result of negligent or willful conduct.

     (7)   Whether Boaz is entitled to liquidated damages, pre- or post-judgment interest, attorney fees and costs for her claims under the [FLSA].

(Joint Pretrial Order 21, ECF No. 195.)

At the trial, Boaz called the following witnesses: (1) herself; (2) Janice Avery-Walthall, former Compensation Advisor with FedEx Express, by deposition and live; (3) Pat Gresham, an IT generalist with IBM who frequently performed work with FedEx, by deposition; (4) Gina Adkins, Contract Manager for FedEx's World Revenue Operations, by deposition; and (5) Denyce Burns, former Manager of the Quality Performance Management department, by deposition and live. FedEx called: (1) Janice Avery-Walthall; (2) Denyce Burns; and (3) Janie Mennis, former Senior Human Resources Representative with FedEx Express.

Based upon the evidence presented at trial, argument of counsel, and the record as a whole, the court grants judgment in favor of FedEx.

## I.   FINDINGS OF FACT

### A.   Boaz's EPA Wage Discrimination Claim, 29 U.S.C. § 206(d)

#### 1.   *FedEx's I-Service Reorganization*

In 2000 through 2005, FedEx underwent a reorganization referred to as I-Service in order to address declining profits and improve its overall profitability. Janice Avery-Walthall

3

("Walthall"), who was employed with FedEx Express as a Compensation Advisor from 1997 to 2006, testified in length about the genesis and implementation of the I-Service reorganization. According to Walthall, after acquiring a number of companies in 2000, FedEx faced a need to reorganize its staffing organizations.[2] The goal of I-Service, which happened in three phases, was to organize the staff units by consolidating functions in order to eliminate the redundancies in force and processes.

During Phase One of the I-Service reorganization, FedEx's executive management formed a steering committee which was charged with comprehensively analyzing the staffing organizations in order to identify opportunities to reorganize the staff and management functions. Phase One lasted approximately eight months. Walthall's role during this phase was to provide employee data to the steering committee.

During Phase Two, the steering committee took a deeper dive into the organizational/divisional level to determine how much staff was needed in each particular division. After this analysis, FedEx knew that it had too many people performing duplicate work as well as processes that were no longer efficient. FedEx consolidated and centralized functions and

---

[2]In FedEx vernacular, the term "organizations" refers to the different divisions of FedEx. Each FedEx organization contains multiple departments within it.

departments in order to eliminate redundancies and duplication of efforts. During this phase, new departments were formed and jobs were moved between departments to better serve the functionality of each department. Starting in June 2003, FedEx offered voluntary buyout packages to employees who were performing functions that FedEx no longer needed performed. These employees were given until September or October 2003 to make a decision whether or not to take the buyout package. Approximately 3,600 employees, which is over one-third of FedEx's staff, took a voluntary buyout package. Employees who did not take the buyout package were allowed to bid on other jobs within FedEx, and if they did not find a job internally, they were placed under the staffing effectiveness policy. Under this policy, if an employee did not have another job within ninety days, they were terminated.

Phase Three, known as the implementation or the cleanup phase, started in late 2003/early 2004 and continued through early/mid-2005. During this phase, each organization looked internally, ascertained how many people remained in that organization after the buyout, and realigned the jobs within that organization. The Compensation Department had to take a fresh look at all of the organizations and the jobs within the various departments to make sure that they were properly classified. Specifically, Walthall reviewed all the jobs in the

organizations she was supporting, realigned the jobs, and eliminated jobs that no longer fit in that organization whether they were Grade Level ("GL") 25, 26 or 27.

Sheila Harrell ("Harrell"), the Vice-President of the Global Customer Services Strategic Planning division, also reorganized and realigned jobs within her organization. Walthall was the primary support for Harrell's organization and her role was to help Harrell's organization to decide on the right jobs needed to perform the functions of that organization. Walthall testified that specifically the GL 27 Project Management Advisor ("PMA") position, which is a high level management position, was over-utilized in Harrell's organization. After employees took the buyouts, there were forty PMA positions left, and eighteen of those positions were in Harrell's organization. Walthall considered this to be a greatly disproportionate amount and an abuse of the position. To remedy the issue going forward, Walthall established that before posting a GL 27 PMA position, managers had to show to the compensation group that the duties that were being performed actually met the requirements in the job description.[3]

---

[3]To illustrate the reorganization process, Walthall testified about the changes that her own department — the Compensation Department — underwent due to the I-Service reorganization. Originally, the Compensation Department had twenty employees, ten of which took a voluntary buyout in Phase Two. In Phase Three, Walthall's manager along with other

Janie Mennis ("Mennis"), who has worked in FedEx's Human Resources Department ("HR") since 1985 and during the relevant time served as a Senior HR Representative supporting Harrell's organization, also testified about some issues that resulted from the I-Service reorganization.  Mennis stated that FedEx lost a lot of employees through the buyout and there were some employees who did not find a home.  Mennis testified that at the end of the I-Service reorganization, employees were being placed in other departments often performing functions that did not match the job description.  In other words, while the employee met the minimum specifications for the job and held the title for that particular position, he or she was not performing the functions of the job.  Mennis testified that this was a problem for management because employees were in job titles that did not fit the functionality of the department.

There was conflicting testimony about when the I-Service reorganization ended.  Walthall testified that it ended in 2005 and Boaz testified that I-Service reorganization ended in mid-2003.  Walthall testified that she played a direct role with all

managers determined that the department needed only five people to perform the compensation functions.  The five employees chosen to remain were selected based on a rating and they were given offer letters.  The other five employees had ninety days to bid and find another position within FedEx.  Walthall was selected to stay and signed an offer letter for the same GL 26 position that she previously held. Her job duties included those of two other employees who left the department, one of whom was a GL 27 employee.

of the phases of the I-Service reorganization and was especially involved in Phase Three of the reorganization by evaluating and realigning positions.   The court finds Walthall's testimony regarding the reorganization to be more credible than Boaz's on this point.

2.   *Boaz's Undertaking of the Print and Archive Vendor Liaison Duties*

In approximately November 2003, during Phase Two of the reorganization, Denyce Burns ("Burns") was notified that she would be starting a new department under the umbrella of the Global Customer Services Strategic Planning organization, charged with developing a quality focus for FedEx's World Revenue Organization.   This department would report to Paul Strube ("Strube"), who in turn would report to Harrell.   The new department would be comprised of four of Burns's existing employees, five employees from other organizations of FedEx, and it would have some open positions.   Burns testified that the goal of the new department was to have an all-exempt level staff.[4]   Boaz was one of Burns's existing employees who was assigned to the new department.   Boaz was hired by FedEx on February 16, 1997, in the Customer Service department on a part-

---

[4]The terms "exempt" and "nonexempt" refer to an employee's status under the FLSA.   As discussed *infra*, FedEx is legally obligated to pay overtime compensation to a nonexempt employee; but an exempt employee is not subject to FLSA's overtime compensation requirement.

time basis and started working under Burns as a full-time, nonexempt, GL 7 Quality Assistant in 2001. (Defs.' Answer ¶ 12, ECF No. 109.)

Another person affected by the I-Service reorganization was Jim Terrell ("Terrell"), an exempt GL 27 PMA who was responsible for the print and archive vendor liaison duties.[5] As part of the reorganization, Terrell elected to take a voluntary buyout, and in December 2003, his print and archive vendor liaison function was moved from the World Revenue Organization workgroup to Burns's workgroup. Burns testified that she believed that the print and archive vendor liaison position did not fit with her department. Ultimately, the decision was made that it would remain in her workgroup. After his transfer and until he left FedEx, Terrell reported to Burns.

It is undisputed that Boaz was assigned to physically sit with Terrell in December 2003 until his resignation was effective in January 2004 in order to gain knowledge of the day-to-day operation of the print and archive vendor liaison duties. (Joint Pretrial Order 10, ECF No. 195.) Boaz testified that Burns assigned her to shadow Terrell in order to start learning

_____

[5]Boaz testified about the function of the print and archive vendor liaison. FedEx uses vendors to print its invoices that go to the customers and to archive the invoices. The print and archive vendor liaison is the contact point between the vendors and FedEx. The liaison troubleshoots any issues that arise in the process and gets the right people at FedEx involved to solve these issues.

his job.  Boaz further testified that she sat in a cubicle with Terrell for two months, overheard his phone calls, accessed his emails, and participated in conference calls.  Boaz testified that Terrell had an "Outline of Responsibilities" pinned to his cubicle wall.  According to this outline, Terrell's duties encompassed four facets: (1) Print Vendor Support; (2) Corporate Load Support; (3) Archive Vendor Support; and (4) Single Invoice Team.  (Trial Ex. 2.)  Boaz testified that Terrell taught her about each of the four topics comprising his responsibilities. At this time, Boaz was classified as GL 7 Quality Assessor, a nonexempt position with FedEx Express.

Burns testified by deposition that initially Boaz was asked to document standard operating procedures for the print and archive vendor liaison duties that Terrell was performing.  Both Burns and Boaz testified that Burns never promised Boaz that she would get the job, but instead that Burns told Boaz that she would have an opportunity to apply for it once the job posted.

It is clear from the testimony at trial that after Terrell left, Boaz began performing Terrell's duties as enumerated in the Outline of Responsibilities pinned to the cubicle wall. Boaz testified that Terrell introduced her as his replacement on multiple conference calls and various meetings and that after Terrell left, Burns handed Terrell's beeper to Boaz and instructed her to do everything that Terrell was doing.  Boaz

moved to Terrell's cubicle, used his computer, and had access to his files and emails.  On May 10, 2004, Boaz prepared a "90 Day Review of Print and Archive Vendor Project Management Advisor Position" for Burns, documenting all the duties encompassed in the job she was doing.  (Trial Ex. 3.)   In addition, Boaz created multiple documents setting out the standard operating procedures of her print and archive vendor liaison job.  (Trial Exs. 12-15.)   Boaz entered into evidence a comparative analysis of Terrell and Boaz's emails which reflects substantial similarities in the tasks performed by Terrell and those later performed by Boaz.  (Trial Ex. 8b.)

Other witnesses testified that Boaz performed Terrell's duties after his departure from FedEx.  Pat Gresham ("Gresham"), an IBM IT generalist who frequently performed work with FedEx, testified that Terrell introduced Boaz as his replacement in a weekly conference call in January 2004.  Gresham testified that after Boaz took over the responsibilities of the print and archive vendor liaison position, the routine or the procedure did not change and that Boaz performed the same duties that Terrell had performed when he interacted with Gresham.  Gina Adkins ("Adkins"), a GL 27 PMA who was a business partner of Terrell and served as Contract Manager for FedEx's World Revenue Organization over the print and archive vendors, testified that Boaz took over Terrell's position and performed Terrell's work.

11

Additionally, a letter dated June 21, 2004 — nominating Boaz for a Circle of Success award — states that Boaz "was asked to take on the role of Print and Archive Vendor PMA, to replace an employee that took the voluntary severance package." (Trial Ex. 47.)   This letter further states that Boaz "learned the new position so well that she has been doing it ever since (a grade 7 doing a grade 27 job)." (*Id.*)

There was conflicting evidence whether Terrell performed any other duties beside those listed in the Outline of Responsibilities.   Boaz testified that during the time she followed Terrell, he did not perform any other duties beside those listed in the Outline of Responsibilities.   Gresham testified that he was told Boaz was assuming Terrell's duties in terms of how they related to Gresham and that he did not know whether Terrell had additional duties.   Adkins testified that Boaz was performing 99% of the tasks that she had observed Terrell perform.   Adkins testified that Terrell had taken some classes to learn about the IBM system and he was able to create IDs and password for employees to access the IBM system, and that this task was the only task that Boaz did not perform.   On January 3, 2005, Adkins sent an email to Boaz stating that Boaz was "performing all the tasks that Jim did."   (Trial Ex. 44.) Both Gresham and Adkins testified that early on Terrell worked on projects that would have ended or been systemized and reduced

12

to day-to-day operations, such as the IBM OnDemand, and that after Terrell left, Boaz handled the day-to-day operation of these projects as well as new projects that came along.

Burns testified that Terrell had other duties, but when pressed on the witness stand, she could not identify any other duties that Terrell was performing. In her testimony, Burns disputed that she handed Boaz the beeper and instructed Boaz to do everything that Terrell was doing. However, Burns acknowledged more than once in writing that Boaz had "stepped in to fill the shoes of the Print and Archive Vendor PMA position (grade 27)," (Trial Exs. 10, 11), although at trial she stated that she had used a poor choice of words in her recommendation letters due to her zealousness in advocating for Boaz. Similarly, Walthall testified that Terrell's PMA position must have entailed other duties besides the print and archive vendor liaison function, but she was not able to specifically identify any other duties either.

Further, there was testimony that Boaz was also involved with projects which were outside the scope of Terrell's duties. (Aff. of Boaz, Trial Ex. 32.) Boaz testified that she upgraded the IBM OnDemand system, integrated invoices resulting from FedEx's purchase of SmartPost and Parcel Direct, implemented a new print vendor with a company called R.R. Donnelly, and worked on a project called Revised Invoice Format. Adkins also

13

testified that while Terrell had finalized some projects, Boaz became responsible for the new projects that came along.

The parties have stipulated that despite the changes in job titles and pay grades, *see infra*, Boaz was responsible for performing the print and archive vendor liaison duties from February 1, 2004 through June 15, 2008. (Joint Pretrial Order 15, ECF 195.)  During this period, Boaz was not paid as a GL 27 PMA. (*Id.* at 11.)

> 3.   *The GL 26 Offer and Rescission*

As part of the I-Service process, new positions were posted in Boaz's department for which Burns conducted several interviews and made several job offers.  Burns interviewed Boaz and Stephanie Grayer ("Grayer") for GL 26 Senior Performance and Planning Analyst positions, and both employees received offers. Boaz testified that Burns told Boaz that the newly posted GL 26 position represented Terrell's job and encouraged Boaz to apply. Burns testified that although she did not do any analysis of whether the duties Boaz was performing met the job description of GL 26, she determined that Boaz (and Greyer) met the minimum qualifications for the job. (*See* Trial Ex. 34.)  On May 18, 2004, Strube gave Burns permission to hire both Boaz and Grayer in a GL 26 position. (Trial Ex. 46.)  On May 19, 2004, Boaz received an offer letter for the GL 26 position of Senior Performance and Planning Analyst. (Trial Ex. 5.)

14

There was on ongoing dispute between Burns, Mennis, and Walthall whether the GL 26 position was appropriately posted in Burn's department and whether Boaz met the minimum specifications for this job. After the job offers were extended to Boaz and Grayer, Mennis conducted an analysis and determined that neither Boaz nor Greyer met the minimum qualifications for the GL 26 positions. Mennis testified that ideally a manager consults with HR before extending a job offer to ensure that the applicant meets the minimum job requirements. Once a job is extended, the manager must complete a Prism Authorization Form, which often requires approval from HR. Mennis received such a form from Burns and conducted an analysis of whether Boaz met the minimum qualifications for the GL 26 position. Both Mennis and Walthall testified that as HR advisor, Mennis only performed an evaluation of whether Boaz met the minimum qualifications for the job and that she did not perform an evaluation of the job itself.

In an email dated June 1, 2005, Mennis wrote to Burns that she had reviewed Boaz's and Grayer's applications, (Trial Ex. 31), and that these employees did not meet the minimum specs for the GL 26 PMA position. (Trial Ex. 35.) Mennis instructed Burns to rescind the job offers meantime. (*Id.*) Mennis testified that this was a recommendation as the ultimate decision on the rescission remained with the manager. On June

15

8, 2004, Mennis wrote another email to Burns stating that upon further review of all documents, neither Boaz nor Grayer met the minimum requirements for the position.  (Trial Ex. 60.)

Mennis testified in length about the process she followed to determine whether Boaz met the GL 26 minimum requirements.  A GL 26 position requires, among other things, a bachelor's degree or equivalent in business, computer science, or a related quantitative discipline, and five years exempt experience in business operations planning and analysis or project management. (*See* Trial Ex. 60.)   Mennis reviewed FedEx's Standards for Defining Job Requirements, (Trial Ex. 16), and concluded that Boaz did not meet the degree qualification and the high-level experience requirement.

As to the degree requirement, Boaz holds a B.S. in Communications, with a major in Advertising.  (*See* Trial Ex. 31.)   Mennis determined that Boaz's degree did not satisfy the GL 26 requirement of a bachelor's degree in business, computer science, or a related quantitative discipline.  Boaz, however, contended that her communications degree by the University of Tennessee qualified as a business degree.  Boaz provided Burns with a document listing the core courses for her degree, (Trial Ex. 45), which Burns forwarded to Lana Luster, Mennis's superior.  On cross-examination, Mennis testified that she never saw this document.  In a letter to Burns dated June 8, 2004,

16

Mennis stated that she would "contact UT to confirm that their marketing degree is in the college of communications as well as review the curriculum and courses that it contains." (Trial Ex. 60.) Mennis testified, however, that she did not contact the University of Tennessee but instead looked at its website where she did not find anything to substantiate Boaz's claim that her communications degree was in the College of Business. Ultimately, Boaz received a credit of two years toward the degree requirement for her communications degree.

As to the professional experience requirement, Boaz indicated in her application for the GL 26 position that she served as an Associate Project Manager at Haines Electric from August 1, 1993 until December 31, 2000, (Trial Ex. 31), which would suffice to give her the experience required for the GL 26 position. Mennis compared Boaz's original application at the time of hire, (Trial Ex. 29), with the resume Boaz submitted for the GL 26 position, (Trial Ex. 31), and found discrepancies regarding dates, titles, and job responsibilities. (Trial Ex. 60.) Specifically, in her original application to FedEx dated December 26, 1996, Boaz stated that she served as a Customer Service Manager at Haines Electric from August 1, 1993 until the time she applied at FedEx. (Trial Ex. 29.) In her June 8, 2004 email to Burns, Mennis expressed concerns that Boaz had altered her resume to "more closely reflect the [GL 26] job

17

duties." (Trial Ex. 60.)   Mennis testified that because of the discrepancies in the two applications by Boaz, Mennis decided to rely on Boaz's December 26, 1996 application in order to determine whether Boaz met the minimum qualifications for the GL 26 position.

During cross-examination of Mennis, Boaz introduced into evidence a letter dated June 10, 2004 from Boaz's previous employer, Mark Haines of Haines Electric, stating that in 1994 Boaz was promoted to Associate Project Manager and that Haines Electric had "utilized [Boaz] for all of the [GL 26] skills over the course of her seven years with [Haines Electric]." (Trial Ex. 52.)   Mennis testified that she did not contact Mark Haines to discuss Boaz's previous job because she was not aware of Haines Electric's letter during the process of evaluating Boaz's qualifications for the job, and because normally HR does not call employers for verification but relies on what the employee discloses in her job application.

Mennis ultimately determined that the duties that Boaz was performing as a Customer Service Manager at Haines Electric did not meet the high-level exempt experience required by the GL 26 position.   Mennis then reviewed the rest of Boaz's professional experience — as provided by Boaz in her application to FedEx — and ultimately determined that Boaz's cumulative experience did not satisfy the minimum five years of high-level experience

required by the GL 26 position.  Unsatisfied with Mennis's determination, Burns turned to Walthall for a second opinion.

Walthall testified that she also reviewed Boaz's qualifications for the GL 26 position and determined that she did not meet the minimum qualifications.  Walthall additionally determined that Boaz's job responsibilities did not match a GL 26 Senior Performance and Planning Analyst position and that the posted GL 26 position did not fit in with Burns's department. Both Walthall and Burns testified that Walthall asked Burns to provide her with the essential duties and responsibilities of the print and archive vendor liaison position so that Walthall could determine whether she could provide Burns's department with a job for those duties.  Walthall and Burns had many discussions about the primary duties and responsibilities of the print and archive vendor liaison.  Walthall testified that after Burns provided her with the print vendor liaison job duties, Walthall determined that those job responsibilities did not match a GL 26 Senior Performance and Planning Analyst position.

It is undisputed that after an ongoing debate between Strube, Burns, Walthall, and Mennis, the GL 26 position was ultimately rescinded and Boaz was returned to a GL 7 position. In July 7, 2004, Boaz received a letter notifying her that the job was rescinded because, primarily, the job was posted in

error, and secondarily, Boaz did not meet minimum specifications. (Trial Ex. 54.)

It is also undisputed that Terrell's job duties were not evaluated prior to his departure from FedEx. Walthall testified that she did not conduct an analysis of the duties that Terrell had performed before he left because they did not need to know what someone had been doing prior to the I-Service reorganization. Walthall testified that there was a July 2003 directive to suspend individual job evaluations because it was anticipated that the Compensation Department would take a close look at each department and realign the existing work. Walthall further testified that if Terrell had remained, he would have been assigned additional duties to maintain his GL 27 PMA position. Alternatively, if Terrell had remained and performed only the print and archive vendor liaison duties, his GL 27 position would be eliminated or downgraded.

Boaz introduced into evidence FedEx Policy 3-55 Job Evaluation and Analysis, last revised on August 1, 1990. This policy states that "[i]f a reorganization adversely impacts a position, the position may be downgraded as a result . . . [and] evaluated for proper grade assignment." (Trial Ex. 58.) Further, this policy states that "[s]alary rate protection is provided to employees who downgrade as a result of reorganization." (*Id.*) According to Boaz, this policy

establishes that had Terrell been downgraded, he would have maintained the same salary. Walthall explained that this is an old policy, and FedEx policies are revised and updated regularly. Further, Walthall testified that this policy applied to the reorganization of one department, while I-Service applied to all of FedEx, and this policy does not necessarily mean that Terrell would have kept his pay after his position had been reevaluated. In her March 18, 2010 deposition, Walthall stated that she did not know how I-Service applied to this policy.

While Walthall determined that Boaz's job responsibilities did not match a GL 26 position, she did not evaluate Boaz's actual job duties to determine a matching position. Burns testified that at this time Walthall did not give Burns an evaluation of Terrell's job duties and that the rescission of the GL 26 offer was not based on such evaluation. At this time the Compensation Department only determined that Boaz's job duties did not amount to a GL 26 position. Walthall testified, however, that in 2004-2005 she was in an ongoing communication with Burns to determine what jobs better fit her department.

On July 8, 2004, Burns then approved Boaz for a GL 27 PMA position. (Trial Ex. 36.) There was an ongoing debate between Walthall and Burns about whether Boaz's job duties fit a GL 27 PMA position. Walthall testified that based on her experience and knowledge, the print vendor liaison duties formerly

21

performed by Terrell did not fit a Grade 27 PMA position. Walthall testified at length about the hallmarks of the GL 27 position. The GL 27 position is a high-level position that could be on an equal footing with a management position. The person performing in this position is responsible for managing multiple cross-divisional complex projects, conducting analysis, developing the business purpose of a project or program, presenting regularly to executive management and steering committees, and assigning responsibilities and tasks to other staff. (*See* Trial Ex. 55.) A non-PMA could work on complex projects, but, unlike a PMA, that would not be her primary duty. Mannis also testified that Boaz did not meet the minimum specifications for a GL 27 position, which requires a bachelor's degree or equivalent in business, computer science, accounting, finance or a related degree, seven years of exempt experience in project/program management, and experience in planning major projects. (*See* Trial Ex. 55.)

Burns testified that it took some convincing, but in the end she agreed with Walthall that the duties that Boaz was performing did not meet the GL 27 job description. Burns testified that Boaz was the subject-matter expert of the print vendor archive job and was providing input on multiple projects, but she was not running the projects. Burns testified that at FedEx an employee starts as a subject-matter expert, then builds

up to a project analyst, and ultimately becomes a GL 27 project manager.  As a subject-matter expert, Boaz provided input and led subprojects, which build into major projects, which build into the larger overarching initiatives. (*See* Trial Ex. 59.)

Walthall acknowledged in her testimony that from February 2004 until December 2004, Boaz was in her position wrongfully — meaning that she was performing higher level duties while classified as a nonexempt GL 7 employee — but that FedEx rectified the situation in December 2004 when they provided the GL 25 job to Burns's department.  In addition, Boaz was also given special assignment credit for her work between December 2003 through April 2005, *see infra*.

On cross-examination, Mennis was asked whether she was aware that until June 2008, Boaz was performing the same job function and responsibilities that were turned over to her from Terrell, a GL 27 PMA.  Mennis replied that she was not aware that Boaz was performing a PMA job.  Mennis testified that if that were the case, she would have ensured that Boaz was not performing higher level GL 27 work while in a lower level GL 7 position.  Mennis testified that qualifications and job duties go hand-in-hand because in order to do the job duties of the job, the employee should be qualified to do that job.

The court finds Mennis's testimony on whether Boaz met the minimum specifications for the GL 26 and GL 27 job to be

23

thorough, detailed, and very reliable.  The court also finds Walthall's testimony regarding the evaluation of Boaz's job responsibilities reliable.  Walthall, Mennis, and Burns testified consistently with one another on this issue, lending further weight to their credibility.

4.  *The GL 25 Position*

Walthall testified that after the GL 26 position was rescinded and sometime between June 1, 2004 and October/November 2004, Burns asked Walthall for a new job description to perform the print and archive vendor liaison duties.  Walthall approved a GL 25 Quality Administrator position for Burns's organization and Burns posted that position.  Boaz applied but was ultimately denied the right to interview for the GL 25 Quality Administrator position.  On September 20, 2004, Mennis determined that Boaz did not meet the minimum requirements for the GL 25 position but that Boaz met the minimum requirements for a GL 23 position.  (Trial Ex. 61.)  Mennis testified that HR and Compensation determined that Boaz did not meet the qualifications to be in a GL 25 position because a GL 25 included a requirement of five years exempt level experience in project management, (*See* Trial Ex. 62), which Boaz lacked. Mennis testified that Boaz's degree was not an impediment because the GL 25 position required a bachelor's degree in any discipline.

On September 17, 2004, Boaz filed an internal Guaranteed Fair Treatment ("GFT") complaint with FedEx Express challenging FedEx's decision to deny her an interview for the GL 25 position. FedEx's Guaranteed Fair Treatment Procedure/EEO Complaint Process, Policy 5-5, which was in effect in 2003 for FedEx Express employees, provides a procedure for handling employee complaints, problems, concerns, and allegations of employment discrimination. The GFT Procedure is a three-step process and applies to all allegations of discrimination. On October 6, 2004, after conferring with Mennis, Strube upheld the management's determination that Boaz was not qualified to hold a GL 25 position. (Trial Ex. 63.) Boaz chose not to proceed to the next step in the GFT process and did not appeal FedEx Express's determination that she was not qualified for a GL 25 position.

The GL 25 Quality Administrator job was posted again and Boaz again applied for it. In November 2004, Boaz received an offer letter for the exempt GL 25 position which she performed from December 1, 2004 until April 2005. It is unclear from the testimony why Boaz was allowed to perform in this position after the determination that she did not meet the minimum specifications. Boaz testified that she got this job because no one else applied and she had already completed a panel interview. Walthall testified that they gave Boaz the quality

25

administrator position in the interim until they finished the I-Service review of Burn's organization.  Boaz testified that based on the interview she thought that she was going to perform duties related to a quality administrator, but Burns told her to keep performing the print and archive vendor liaison job duties.[6]

     5.   *The Special Assignment Credit*

On April 25, 2005, Boaz received a letter from Tom Mullady, a Compensation Manager, awarding Boaz special assignment credit for her work from December 2003 through April 2005.  (Trial Ex. 17.)  A special assignment credit is awarded when an employee performs work that is not part of the work that she was hired to perform.  Burns testified that there is no pay adjustment during a special assignment.  The employee who is awarded a special assignment merely gets credit for the job performed so that she can refer to it when applying for other positions at FedEx.  The special assignment letter addressed to Boaz states in relevant part:

> Due to the organizational/realignment project in Customer Service Strategic Planning and Analysis, all

---

[6]On February 8, 2005, Boaz wrote a letter to Janice Avery-Walthall, her Compensation Advisor for FedEx Express, requesting a compensation review for the period December 15, 2003 through December 1, 2004, for "duties being performed as a Grade 27 PMA."  (Trial Ex. 40.)  According to Boaz's affidavit testimony, Walthall met with Boaz and told her that there was nothing either one of them could do.  Walthall testified by deposition that she investigated and determined that Boaz did not meet the minimum requirements for a GL 27 position and that her job duties did not match a GL 27 PMA position.

> time worked on special assignment in the Quality
> Assurance & Performance Measurement department will be
> considered as grade level 21, Entry Level Quality
> Assurance Systems/Technical Support experience.

(*Id.*)

It is undisputed that the special assignment credit was not conducted in conformity with FedEx guidelines. FedEx guidelines state that:

> Credit may be given for experience within a special
> assignment for exempt jobs ONLY. . . . In order for
> experience to be credited for a special assignment, a
> Letter of Understanding must be developed prior to the
> start of the assignment. . . . Letters of
> Understanding should be established for special
> assignments of no less than 90 days and not to exceed
> 1 year.

(Standards for Defining Job Requirements 2, Trial Ex. 16.) Boaz was not given a Letter of Understanding prior to being assigned a special assignment, and her special assignment lasted more than one year. Walthall testified that it is very unusual for a special assignment to last more than eleven months. Walthall further testified that special assignments are only given to exempt employees and that nonexempt employees should not be performing exempt level jobs unless they get an approval from management. Further, if the application for special assignment had gone through her office, she would not have approved it. Walthall also stated that, although not ideal, special assignment credit can be awarded retroactively.

6.  *The GL 23 Position*

In May 2005, Boaz was notified that her GL 25 position was being eliminated and that a few employees were going to be realigned into other positions. Burns testified that at this time the overarching deep dive of Phase Three of the I-Service reorganization was completed and a decision was made to reclassify and eliminate positions. Burns testified that between twelve and fifteen people were impacted in Harrell's organization and their jobs were taken away. The impacted employees were eligible to apply for special postings within FedEx. Having secured no job, Boaz testified that she received a letter from Burns notifying her that she had ninety days to find a job internally.

In an email dated May 2, 2005, Walthall determined that Boaz satisfied the minimum requirements for a newly posted GL 23 Project Planning Analyst position. (Trial Ex. 57.)  Walthall also testified that she evaluated the duties that Boaz was performing and determined that they fit the GL 23 position "perfectly."[7]  Boaz applied, and on May 18, 2005, was offered an

---

[7]The GL 23 Systems Support Analyst job description is the following:
>    To coordinate the evaluation, development, and design
>    of proposed and current computer applications.
>    Provide system support to user by answering client
>    questions and making recommendation to improve
>    efficiency and effectiveness of operations and to

exempt GL 23, Quality Assurance Systems Support Analyst position. (Trial Ex. 28.) Despite the change in grade level, her compensation remained the same as the prior GL 25 position. (*See id.*)

In June 2006, FedEx Global Strategic Planning came under the umbrella of FCIS, a division of FedEx Services, and thus, Boaz became an employee of FCIS. Due to another reorganization, Burns's workgroup was dissolved, and, on June 5, 2008, Boaz was notified that her position as a GL 23 Quality Assurance Systems Support Analyst would be eliminated. On June 12, 2008, Boaz accepted a position as a GL 22 Associate Business System Support Analyst with FCIS, and on Sunday, June 15, 2008, she ceased performing the duties she claims were previously performed by Terrell. Boaz received no reduction in pay or benefits. She received her last paycheck as GL 23 on June 30, 2008.

Upon Boaz's acceptance of the Associate Business System Analyst position, Margaret Williams, a GL 27 PMA, assumed Boaz's duties relating to the print vendor liaison function. Burns testified Williams performed those duties in addition to other responsibilities she had as a GL 27. Adkins also testified that Williams "does more things" outside of the print and archive

---

ensure adherence to departmental policies and procedures.
(Trial Ex. 56.)

vendor function, but that she did not know exactly what Williams did.

On April 8, 2009, Boaz filed a Charge of Discrimination with the EEOC alleging discrimination based on sex and retaliation. (Defs.' Answer ¶ 37, ECF No. 109.)   On March 24, 2010, Boaz filed an Amended Charge of Discrimination. (*Id.* ¶ 41.)   On June 22, 2009, FedEx replied to EEOC's request for a statement of position. (Trial Ex. 38.)   In its response, FedEx maintained that Boaz was not assigned all of the job tasks of Terrell's GL 26 PMA position, and that from June 1, 2006 through June 15, 2008, as part of a special assignment, Boaz was asked to perform only one responsibility previously performed by Terrell. (Trial Ex. 38.)[8]

7.   *Boaz's Awards and Performance Reviews*

The proof was uncontroverted at trial that Boaz was excellent at her job.   From 2004 to 2008, Boaz received exceptional performance ratings by Burns. (Trial Exs. 18-22, 48.)   On June 21, 2005, Boaz was nominated for a Circle of Success award, (Trial Ex. 47), which she received on August 12, 2004, (Trial Ex. 53).   Boaz testified that she has received multiple Bravo Zulu awards from WRO, the Orlando Data Group, and

---

[8]The dates that FedEx provided to the EEOC regarding the special assignment conflict with the testimony presented at trial which establishes that Boaz received a special assignment credit for the period of December 2003 until April 2005, (*See* Trial Ex. 17).

Burns.  On August 15, 2005, Burns nominated Boaz for a Purple Promise Five Star Award, which is considered a very prestigious award at FedEx.  (Trial Ex. 49.)   On October 6, 2005, Burns congratulated Boaz on a job well done and awarded her a Bravo Zulu.  (Trial Ex. 48.)

B.   Boaz's FLSA Overtime Compensation Claim, 29 U.S.C. § 207(a)

The parties stipulated that from approximately February 2004 to June 2008, Boaz was the only employee in her department who regularly carried a beeper, 24 hours a day, 7 days a week. (Joint Pretrial Order 10, ECF No. 195.)  It is undisputed that Boaz was recalled at night and on weekends to attend to emergencies.

As stated above, from December 2003 until December 1, 2004 when she was placed in a GL 25 position, Boaz was classified as a nonexempt GL 7 employee.  Walthall testified that a nonexempt employee should not be carrying a beeper.  FedEx Express Policy 3-5 Overtime Pay for Nonexempt Employees states that "FedEx Express provides remuneration above regular rates of pay for extended workdays/workweeks consistent with general industry overtime (OT) practices for nonexempt employees."  (Joint Pretrial Order 11, ECF No. 195.)   FedEx Express Policy 3-42 Emergency Recall/Call-in Pay-Nonexempt Employees states:

> FedEx Express provides compensation to nonexempt
> employees who are recalled or called in to work due to
> an emergency . . . .   Recall/Call-in pay is included

31

> in the calculation of OT premium pay. When a full-
> time employee is recalled/called in, at least 4 hours
> should be combined with the hours already worked that
> day for calculation of OT.

(*Id.*)

From December 1, 2004 until June 15, 2008, Boaz was classified by FedEx as an exempt level employee. Walthall testified that an exempt employee's time should not be tracked because they are not paid by the number of hours worked but by the assignment. Walthall testified that the Compensation Department is responsible for classifying positions as exempt or nonexempt under the FLSA. According to Walthall, the GL 23 position is classified by the Compensation Department as an exempt position because: (1) it meets the salary test of FLSA; (2) the job is directly related to FedEx's general business operations; and (2) the person performing the job has discretion and uses independent judgment.

Although an exempt employee is not entitled to overtime compensation under the FLSA, Walthall testified that FedEx has a policy, Policy 3-44, which provides compensatory time off or a lump sum payment to on-call exempt employees who work in business critical areas. Specifically, FedEx Policy 3-44 "Exempt Standby/On-call Compensation" states:

> FedEx Express provides compensatory time off for
> employees who are required to be on-call for critical
> business purposes, either for days they are not
> scheduled to work or for time before or after the

32

> completion of their regularly assigned shift. . . .
> Employee must abide by the restriction set forth in 2-
> 10 Alcohol and Drug-Free Workplace. . . .   Full-time
> employees are granted 1 hour of compensatory time for
> every 8 "duty" hours on standby. . . .   If
> compensatory time off cannot be scheduled because of
> business conditions, employees can revive a lump sum
> payment for the compensatory time earned, with
> approval by the managing director.

(Trial Ex. 24.)   If an exempt employee is recalled due to an

emergency, FedEx Policy 3-40 Emergency Recall/Call-in Pay –

Exempt Employees provides that a "[c]orporate officer of the

department can . . . authorize prompt payment in lieu of

compensatory time off." (Joint Pretrial Order 12, ECF No. 195.)

Boaz filed three Open Door complaints with FCIS in April

2007, July 2007, and May 2008.[9]   On April 23, 2007, Boaz filed

her first Open Door complaint, addressed to Burns, in which she

complained that she was not being compensated for carrying the

beeper and working off-hours from February 2004 through the time

of filing her complaint.   (Trial Ex. 26.)   In her written

response to Boaz's first Open Door complaint, Burns wrote:

"[Y]ou have been encouraged to use a flexible schedule to

---

[9]FCIS's Open Door Policy, Policy 5-40, effective June 1,
2006, is designed to encourage employees to communicate their
ideas and concerns directly to management.   There is no time
restriction in using the Open Door Policy and no limit on the
number of Open Door issues an employee can submit but an
employee may submit only one Open Door on any particular
concern.   The Open Door policy provides that the Fair and
Impartial Review/EEO Procedure, Policy 5-5, should be used for
specific employee complaints such as discrimination because of
sex.

compensate for any work required outside of a normal work schedule. Effective June 1, 2007, you will be given the option to continue the flexible schedule or submit time to be paid as described in [FedEx policy] 3-44." (Trial Ex. 23.) Therefore, Boaz was allowed to submit time for oncall/recall compensation between June 1, 2007 and June 15, 2008.

Boaz was not given an explanation why she was not paid retroactively and not being satisfied with the determination, Boaz filed her second Open Door complaint in July 2007. (Trial Ex. 27.) Boaz did not receive a formal written response to her second Open Door complaint. On May 22, 2008, Boaz filed her third Open Door complaint in which she again complained for not being compensated for carrying the beeper from February 2004 until June 2007. Boaz did not receive a formal written response to her third Open Door complaint. During discovery, FedEx produced a draft, inter-office memorandum dated May 8, 2007, from Vickie Engelman and Deborah Baur marked "Privileged and Confidential Attorney Work Product in Anticipation of Litigation," ("the Engelman Report"). (Trial Ex. 25.) The Engelman Report was a result of an investigation performed by Engelman and Baur after receiving Boaz's third Open Door complaint. The report concluded that from February 1, 2004 until November 30, 2004, Boaz was a nonexempt employee and eligible for the overtime pay under FedEx's Nonexempt Emergency

Recall/Call-In Pay Policy 3-42.  (Engelman Report 15, Trial Ex. 25.)   The Engelman Report further stated that after December 1, 2004, Boaz was eligible to receive overtime compensation under FedEx's Exempt Standy/On-Call and Emergency Recall/Call-In policies.  (*Id.* at 16.)

Both Boaz and Burns testified about FedEx's flex policy.  A FedEx employee who works outside the normal business hours is expected to flex her time, meaning that the employee can reduce the normal business hours by the time that she works outside her normal schedule.  Boaz testified that she worked forty hours a week, Monday through Friday from 9:00 am to 5:00 pm, and that she did not flex her time because she was not allowed and because there was no one else trained to back up her work.

As to why Boaz was not paid retroactively, Burns testified that she had ongoing conversations with Boaz about flexing her schedule.  Burns testified that Boaz occasionally had to take after hours, late night, early morning, or weekend calls and Boaz was expected to flex her time when she worked outside normal hours.  Burns testified that there was no normal schedule in her workgroup and that it was the employee's responsibility to adjust their schedule to accommodate work in the middle of the nights or weekend and to make sure that there was no need to work overtime.  Burns testified about two occasions when Boaz took time off after she had worked nights and weekends.  While

Boaz was the primary carrier of the beeper, Susan Hurtado, Jodi Moore, Dorothy Williams, and Burns cross-trained to carry the beeper. Burns testified that it was common practice to not be paid for carrying a beeper, even if this practice contradicted Policy 3-44.

When asked whether Terrell received on-call/recall pay, Boaz testified that she had no personal knowledge of Terrell's compensation. Walthall was presented with the earning history of Terrell which contained categories for "other" and "overtime." (Trial Ex. 51.) This document shows that for years 2002 through 2004, Terrell had zero overtime hours but had significant amount of hours listed in the "other" category. (*Id.*) Walthall testified that Terrell was an exempt employee, and, therefore, he would not be paid overtime. However, pursuant to policy 3-44, his on-call/recall time which he could otherwise not flex, would appear in the "other" category and not in the "overtime" category. Walthall further stated that vacation, sick payments, premiums, bonuses, and voluntary buyout payments would also be listed under category "other."

As a GL 23 employee, Boaz was paid a monthly salary of $4180.00. (Trial Ex. 28.) Boaz testified that as the print and archive vendor liaison, Boaz was the contact point between the vendors and FedEx. Her primary duty consisted in ensuring that invoices were properly printed and archived. On cross-

36

examination, Boaz testified that if the invoices were not correct or if they went out late, it had an impact on FedEx's revenue stream.

There was conflicting testimony about whether Boaz required approval from Burns in conducting her duties. Burns testified that Boaz could not make any decisions without her approval with respect to policy, but that Boaz made day-to-day decisions about the management of the business process of invoicing. Boaz, on the other hand, testified on redirect examination that she reported all her activity to Burns and did not make decisions without her approval. The court finds that Boaz's testimony on this point contradicts the weight of the testimony presented at trial. Boaz testified that she coordinated projects; oversaw file transfers; if a file failed in transmission, she researched and corrected the issue; she got the right people on a conference call and acted as a liaison between the print vendor and FedEx until the issue was resolved; and, if the issue involved implementation, it was her duty to be an implementation person. These activities comprised Boaz's primary job duties, and it is clear that Boaz did not require prior approval from Burns in conducting these activities.

In addition to above-listed duties, Boaz supported other projects in her capacity as the print and archive vendor liaison expert. Burns testified that Boaz was a subject-matter expert

in the print and archive vendor liaison function, supported multiple projects, and acted as a minor lead in the part of the project she supported.    Boaz also testified that she worked on complex projects and was lead for her part of the project.    In an affidavit entered into evidence, Boaz stated that she was involved in "projects with a high dollar value and requiring an equal level of skill, effort and responsibility."  (Aff. of Boaz 2, Trial Ex. 32.)    In her affidavit, Boaz listed several "major cost saving projects" for which she served as the implementation lead; she states that she provided considerable input in other projects; and indicates that she proposed cost-saving solutions and recommendations to management.  (*Id.* at 4-8.)

Both Burns and Boaz testified that Boaz did not manage employees, did not have authority to hire or fire, could not establish or deviate from FedEx policies, could not establish budgets, could not bind FedEx contractually, and was not involved in long term business planning on behalf of FedEx.

## II.  CONCLUSIONS OF LAW

A.  Boaz's EPA Wage-Discrimination Claim, 29 U.S.C. § 206(d

1.  *Prima Facie Case*

FedEx argues that Boaz cannot make out a *prima facie* case of wage discrimination under the EPA because she cannot show that she performed equal work as Terrell.  FedEx maintains that Terrell performed other functions other than those performed by

38

Boaz and that Boaz was only assigned Terrell's job duties pertaining to the print and archive vendor liaison function. Boaz, on the other hand, argues that she replaced Terrell but was paid less than him during the period she performed equal work as him.

The EPA "sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it." *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1029 (6th Cir. 1983). The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work. 29 U.S.C. § 206(d)(1). To establish a *prima facie* case under the EPA, the plaintiff must show that the employer paid employees of one sex less than employees of opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). "[P]roof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006)(citations and internal quotation marks omitted).

The regulations promulgated by the Department of Labor, which is charged with administering the FLSA, make clear that the employer need not "formally assign the equal work to the

employee; the EPA applies if the employer knowingly allows the employee to perform the equal work." 29 C.F.R. § 1620.13(a). Further, "[t]he equal work standard does not require that the compared jobs be identical, only that they be substantially equal." *Id.*; *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). "This issue must be resolved by an overall comparison of the work, not its individual segments." *Odomes*, 653 F.2d at 250 (citation omitted).

"Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. § 1620.13(e); *Brennan v. Owensboro-Daviess Cnty. Hosp.,* 523 F.2d 1013, 1017 n.7 (6th Cir. 1975). "Job titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard." 29 C.F.R. § 1620.13(e). "[W]here an employee of one sex is hired or assigned to a particular job to replace an employee of the opposite sex but receives a lower rate of pay than the person replaced, a prima facie violation of the EPA exists." 29 C.F.R. § 1620.13(b)(2).

Boaz has made a *prima facie* showing that FedEx paid her less than Terrell for substantially equal work. The EPA looks to the similarity of the actual duties involved instead of job classifications or titles. *See* 29 C.F.R. § 1620.13(e). The evidence overwhelmingly demonstrates that Boaz took over

Terrell's job duties and performed them from February 1, 2004 until June 15, 2008.   While FedEx maintains that Boaz assumed only a part of Terrell's duties, there is no evidence that Terrell performed any other duties apart from those listed in the Outline of Responsibilities, which comprised all the tasks related to his print and archive vendor liaison function. Although Burns and Walthall testified that Terrell performed other functions outside of his print and archive vendor liaison, neither of them could specifically identify any other duties that Terrell performed.   Gresham and Adkins testified that they had only observed Terrell perform the print and archive vendor liaison duties and were not aware whether he was responsible for any other functions.   Boaz testified that during the time she followed Terrell, he did not perform any other duties beside those listed in the Outline of Responsibilities.

While there was testimony that in the past Terrell had performed additional tasks, there was also evidence that Boaz assumed additional duties.   Both Gresham and Adkins testified that in the past Terrell worked on projects that would have been finalized and reduced to day-to-day operations, and that, after Terrell's departure, Boaz became responsible for the management of the day-to-day operation of these projects as well as new projects that came along.   The FLSA does not require that the compared jobs be identical but only that they be substantially

equal, and Boaz has carried her burden of showing that the job she performed was substantially equal to the job Terrell performed.  *See Odomes,* 653 F.2d at 250.

Moreover, there is ample evidence that Boaz was assigned to replace Terrell.  The testimony showed that Terrell introduced Boaz as his replacement on more than one occasion, and Boaz's Circle of Success nomination letter reflects that it was generally known at FedEx that Boaz replaced Terrell, (Trial Ex. 47).  More importantly, Burns herself acknowledged more than once that Boaz had stepped in to fill a GL 27 PMA position. (Trial Exs. 10 & 11.)  Despite the changes in job titles and pay grades, Boaz was responsible for performing the print vendor liaison duties from February 1, 2004 through June 15, 2008. Terrell was a GL 27 PMA, while Boaz was not paid as a GL 27 during the entire time that she performed Terrell's duties. Because Boaz was assigned to replace Terrell, an employee of the opposite sex, and received a lower rate of pay than Terrell, a *prima facie* violation of the EPA exists.  *See* 29 C.F.R. § 1620.13(b)(2).  Accordingly, Boaz has carried her burden of establishing a *prima facie* case.

2.  *FedEx's Affirmative Defense – Factor Other Than Sex*

If the plaintiff carries her burden of establishing a *prima facie* violation, the burden shifts to the employer to show that the wage differential is justified pursuant to (1) a seniority

42

system, (2) a merit system, (3) a system which measures earning by quantity or quality of production, or (4) any other factor other than sex.   29 U.S.C. § 206(d)(1); 29 C.F.R. § 1620.13(b)(2).  FedEx relies on the fourth affirmative defense, a factor other than sex, arguing that the wage differential between Terrell and Boaz was based on the realignment of the print and archive vendor liaison position.   Thus, FedEx maintains that although Terrell was classified as a GL 27 PMA, FedEx reevaluated the print and archive vendor liaison duties and determined that they matched a GL 23 position.  FedEx argues that the realignment was a result of Phase Three of the large-scale I-Service reorganization that lasted until mid-2005. FedEx also argues that it followed gender-neutral factors to reclassify the position and to determine whether Boaz met the minimum qualifications.

As to the "any other factor other than sex" defense, the Supreme Court has stated:

> The fourth affirmative defense of the Equal Pay Act []
> was designed [] to confine the application of the Act
> to wage differentials attributable to sex
> discrimination.  Equal Pay Act litigation, therefore,
> has been structured to permit employers to defend
> against charges of discrimination where their pay
> differentials are based on a bona fide use of "other
> factors other than sex."  Under the Equal Pay Act, the
> courts and administrative agencies are not permitted
> to "substitute their judgment for the judgment of the
> employer . . . who [has] established and applied a
> bona fide job rating system," so long as it does not
> discriminate on the basis of sex.

43

*Wash. Cnty. v. Gunther*, 452 U.S. 161, 170-71 (1981) (citing EPA legislative history).   In *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), the Supreme Court noted that earlier versions of the Equal Pay bill were amended to add an exception for job classification systems.   *Id.* at 198-201; *see also Wash. Cnty.*, 452 U.S. at 170 n.11 ("The [*Corning Class*] Court observed that earlier versions of the Equal Pay bill were amended to define equal work and to add the fourth affirmative defense because of a concern that bona fide job-evaluation systems used by American businesses would otherwise be disrupted.").   Thus, Congress intended that "wage differentials based upon bona fide job evaluation plans would be outside the purview of the [EPA]." *Corning Glass*, 417 U.S. at 201.   However, "[w]hile a concern about job-evaluation systems served as the impetus for creating the exception, Congress did not limit the exception to that concern," but instead created a "broad general exception." *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 877 (9th Cir. 1982).

In the Sixth Circuit, the "'factor other than sex' defense does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *E.E.O.C. v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988)(citations omitted)(adopting the legitimate business reason standard set out by the Ninth Circuit in *Kouba*); *see also Kouba*, 691 F.2d at 876 ("An employer thus cannot use a factor which

44

causes a wage differential between male and female employees
absent an acceptable business reason.").[10]    The factor must also
be "used reasonably in light of the employer's stated purpose."
*J.C. Penney Co.*, 843 F.2d at 253.   An "illusory" and "post-
event" justification for unequal pay is not a valid factor other
than sex.  *Odomes*, 653 F.2d at 251-52.   The burden of proving
that a factor other than sex is the basis for a wage
differential is on the defendant and is a heavy one.  *Timmer v.
Mich. Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir.
1997)(citation omitted); *Odomes*, 653 F.2d at 251 (citing
*E.E.O.C. v. Whitin Mach. Works, Inc.*, 635 F.2d 1095, 1098 (4th
Cir. 1980)).

　　　a.　Reclassification to Lower Paid Position

　　　This court is not aware of any case in the Sixth Circuit
that has specifically addressed a reclassification of the job

---

[10]The circuits are split on whether a pay differential must
be a product of a legitimate business reason.   The Second,
Sixth, Ninth, and Eleventh Circuits require the factor-other-
than-sex defense to be related to legitimate business goals.
*See, e.g.*, *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520
(2nd Cir. 1992); *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567 (11th
Cir. 1988); *E.E.O.C. v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th
Cir. 1988); *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876 (9th
Cir. 1982).   The Seventh and Eight Circuits do not examine the
business reason for legitimacy as long as the pay differential
is based on a gender-neutral business justification.  *See, e.g.*,
*Taylor v. White*, 321 F.3d 710, 719 (8th Cir. 2003)("In
conducting this examination, our concern is not related to the
wisdom or reasonableness of the asserted defense.   It is related
solely to the issue of whether the asserted defense is based on
a 'factor other than sex.'"); *Fallon v. Illinois*, 882 F.2d 1206
(7th Cir. 1989).

duties into a lower paid position.  The court finds instructive, however, the following two cases from the Sixth Circuit and the following three cases from other courts.

In *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796 (6th Cir. 1998), the Sixth Circuit acknowledged that the adoption of a new salary policy was a factor other than sex. The defendant in *Buntin* claimed that it adopted a new salary policy which capped the compensation for all persons newly hired into administrative positions to 220 employment days with no bonus.  *Id.* at 798.  The plaintiff, who was hired after the adoption of this policy, claimed wage discrimination in violation of the EPA because the defendant paid her less than her male predecessor who was paid for 240 employment days.  *Id.* At trial, the district court granted the defendant's motion for judgment as a matter of law.  The Sixth Circuit reversed, finding that the evidence presented at trial raised a genuine issue of fact whether the defendant's explanation of a cap on compensation was pretextual.  *Id.* at 800.  This case is nevertheless significant because the Sixth Circuit implicitly recognized that the actual adoption of a new bona fide salary policy would qualify as a factor other than sex.

In *Timmer v. Michigan Department of Commerce*, 104 F.3d 833 (6th Cir. 1997), another EPA wage discrimination case, the plaintiff, a female, was employed in the Insurance Bureau of the

Michigan Department of Commerce as an analyst and classified and paid as a Departmental Specialist VII. *Id.* at 835. Esser, a male, also worked as an analyst in the Insurance Bureau responsible for reviewing life insurance and credit card rates. *Id.* The Department's benchmark committee determined that life insurance policies were more complex than other forms of insurance and reclassified Esser as a Departmental Specialist VIII. *Id.* When the plaintiff sought a reclassification of her position from level VII to level VIII, the "benchmark committee reviewed the factors assigned to plaintiff's and Esser's positions and concluded that 'all the program specialist positions in the division would most appropriately be classified at the VII level and that the committee had erred in factoring the Esser position.'" *Id.*

The district court found that plaintiff had established a *prima facie* case under the EPA, but that the defendant had met its burden of proving that a factor other than sex was the basis for the wage differential. *Id.* at 836. The Sixth Circuit affirmed and held that the defendant's "inadvertent misapplication of the job classification system" to Esser's position was a defense within the fourth exception of the EPA. *See id.* at 843-44. Thus, the court implicitly recognized that a

reclassification of the position, even if mistaken as in *Timmer*, is a factor other than sex.[11]

In *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251 (7th Cir. 1985), an EPA wage discrimination claim out of the Seventh Circuit, the plaintiff claimed that she was "replaced by two men, each of whom was paid a higher salary than she had received." *Id.* at 1260.   The defendants rebutted the plaintiff's *prima facie* case by arguing, *inter alia*, that the pay changes were based on a long-term reorganization plan.   *Id.* Testimony at trial indicated that before her discharge, the plaintiff had proposed the creation of an assistant administrator's position to assist her position and higher salary figures for both positions to the County Board but the proposal was either tabled or withdrawn.   *Id.* at 1261.   After her discharge, the selection committee charged with hiring her

---

[11]After the determination that Esser was mistakenly classified to level VIII, the defendant did not reclassify Esser to level VII. Instead, under its "restriction policy," the Department decided to "continue to pay Esser at his current salary level and would grant pay increases, but the next person who moved into his job would be classified as and receive pay in accordance with level VII." *Id.* at 836.   The plaintiff also argued that the restriction policy violated the EPA.   The Sixth Circuit found that the restriction policy fell in the EPA's red-circle rate exception, which "describes certain unusual, higher than normal, wage rates which are maintained for reasons unrelated to sex." *Id.* at 844 (citing 29 C.F.R. § 1620.26). In this case, the restriction policy was maintained for reasons unrelated to sex, specifically to avoid demoralizing employees whose classifications have changed through no fault of their own. *Id.*

replacement adopted a similar reorganization plan and hired two male successors at higher salaries. *Id.*

The *Patkus* court noted that the fact that "the reorganization was initially submitted prior to [plaintiff's discharge] and was only put into effect when her male successors were hired could . . . raise questions about whether sex was a factor in the different salaries paid to different individuals." *Id.* at 1261. The court held, however, that these facts alone did not establish an EPA violation because there was no evidence that the reorganization was a pretext to hire male workers at a higher salary. *Id.* The court noted:

> The "factor other than sex" exemption was intended by Congress to be a "broad general exception" and was added because of a concern that bona fide job-evaluation systems used by American businesses not be disrupted. We view the right of an employer to change and revise the job-evaluation and pay system in use as falling within this area of congressional concern. The effect of a contrary holding here would be to force employers either to forego legitimate organizational planning or to hire only someone of the same sex whenever an employee left a job, or was fired for unrelated reasons, at the critical time. Although the fact or timing of an employer reorganization may well deserve scrutiny, we find little reason to question that, in this case, the reorganization was a legitimate reason for the pay differential based on factors other than sex.

*Id.* at 1261-62 (citing *Cnty. of Wash. v. Gunther,* 452 U.S. 161, 172 (1981)).

In *Little v. Cobb County*, No. 1:03-CV-3973WSD, 2006 WL 839401 (N.D. Ga. Mar. 30, 2006), *aff'd*, 203 F. App'x 993 (11th

49

Cir. 2006), an EPA wage discrimination case out of the Northern District of Georgia, the plaintiffs, two female Cobb County Maintenance Department supervisors maintained that they performed substantially similar jobs to the other seven male Cobb County Maintenance District Superintendents but were paid less than them. *Id.* at *1-2.  In its defense, the defendant presented evidence that it had "hired a consulting group to develop a pay classification system to provide for objective review of job classifications and salaries." *Id.* at *5.  This system provided for a "review, evaluation and classification of every job position in the county according to eight specific factors," and it provided a process for reclassifying a position that was incorrectly classified or needed updating. *Id.*  The eight factors were: "(1) knowledge required by the position, (2) decision making, (3) complexity, (4) scope and effect, (5) significance and purpose of contacts, (6) physical demands, (7) work environment and (8) supervision exercised." *Id.* at *5. Both plaintiffs went through the reclassification system. *Id.* The district court found that the pay classification system was gender-neutral and was applied to the plaintiffs in a gender-neutral way, and thus, it was "an appropriate explanation for the pay differential at issue." *Id.* at *5-6.[12]

_____

[12]The plaintiffs argued that the defendant could not rely on the pay classification system to establish its affirmative

In *Weinand v. Department of Veteran's Affairs of Illinois*, No. 05-3232, 2007 WL 1830840 (C.D. Ill. June 22, 2007), the plaintiff, a male at a salary step 5, sued his employer for hiring Julie Huseman, a female, in the same position at a salary step 7. *Id.* at *4. The employer defendant maintained that the pay disparity between plaintiff and Huseman was due to a factor other than sex. *Id.* at *5. The defendant contended that the pay disparity existed because of a prior salary reconfiguration, as a result of which plaintiff's salary step fell from step 7 to step 4. *Id.* at *6. The defendant asserted that "had there been no such reconfiguration, [plaintiff] would have been paid at the highest pay step [step 7] at the time of Huseman's hire." *Id.*

---

defense because during the reclassification review the plaintiffs' positions were not compared to those of other Maintenance District Superintendents. *Id.* at *5. The court concluded that:

> Plaintiffs presented no case law or evidence to support the proposition that [d]efendant's failure to compare [p]laintiffs['] classification to those of the putative supervisory comparators indicates that the classification system was discriminatorily applied. To the contrary, the Court finds, and [p]laintiffs agree, the eight factors upon which the pay classification system are based to be gender neutral and objectively reasonable. The Court also finds that [p]laintiff's proposed standard, which would require [d]efendant to incorporate into its pay classification system a comparison of the job position in question to all similar job positions in the country, would impose an obligation upon Defendant that is not required by the EPA and, in practice, would be burdensome and unworkable.

*Id.* (internal citation marks omitted).

The court found that "salary reconfiguration constitute[d] a factor other than sex that was responsible for the pay disparity." *Id.*[13]

After analysis of pertinent case law and the congressional history of the EPA, the court finds that a reclassification of a position into a position with a different grade level is a factor other than sex. As noted by many courts, the factor-other-than-sex exemption is broad and specifically created by Congress due to concerns that "bona fide job-evaluation systems used by American businesses would otherwise be disrupted." *Wash. Cnty.*, 452 U.S. at 170 n.11; *Corning Glass*, 417 U.S. at 201; *Patkus*, 769 F.2d at 1261-62. This court agrees with the Seventh Circuit's rationale in *Patkus* that "the right of an employer to change and revise the job-evaluation and pay system in use [] fall[s] within this area of congressional concern." *Patkus*, 769 F.2d at 1261-62. Holding otherwise would limit the

---

[13]The defendant advanced another reason for the pay disparity. The defendant argued that Huseman was hired at salary step 7 because of the defendant's "gender-neutral practice of hiring individuals for the [] position at the highest available pay step, a practice which was driven by market forces." *Id.* at *5. After looking at the evidence, the court found that the defendant had legitimate business reasons for developing its practice of hiring for the position at the highest available pay step, and that the defendant had indeed employed this practice often in the past. *Id.* at *6. Therefore, with respect to this factor, the court found that the defendant's "gender-neutral hiring practice, which was driven by market forces, constitute[d] a factor other than sex that attributed to the pay difference between" plaintiff and Huseman. *Id.*

employer's ability to reevaluate its processes and staffing needs, or worse, lead to the absurd scenario of forcing an employer to replace an employee with another employee of the same sex after a reevaluation of the job and pay system. Moreover, the Sixth Circuit has implicitly recognized that a bona fide job or salary reclassification leading to a wage disparity is a factor other than sex.

   b.   Legitimate Business Reason

   Next, the court must determine whether the factor causing the wage differential was adopted for a legitimate business reason as required by the Sixth Circuit in *J.C. Penney Co.*, 843 F.2d at 253. It is undisputed that the I-Service reorganization was a large-scale initiative which resulted in 3,600 employees leaving FedEx. During the reorganization, which lasted until mid-2005, FedEx's Compensation department evaluated all functions in all departments and realigned the jobs with the needs of each department. Compensation Manager Walthall testified that she reviewed all the jobs in the organizations she was supporting, realigned the jobs, and eliminated jobs that no longer fit in that organization whether they were GL 25, 26 or 27. FedEx determined that the GL 27 PMA position was being over-utilized, especially in Harrell's organization, which contained eighteen out of the remaining forty company-wide PMA positions. As a result, FedEx closely scrutinized the GL 27

53

positions to ensure proper utilization of that grade level in the future.

The review of Burn's organization was completed approximately in May 2005. Between twelve and fifteen people were impacted in Harrell's organization. Their jobs were eliminated and they were instructed to apply for other postings within FedEx. One of the impacted employees was Boaz, whose interim GL 25 position was reclassified as a GL 23 position. Boaz's assertion that her job duties were never reclassified is contrary to the evidence presented at trial. The evidence shows that Walthall and Burns were in constant communication analyzing Boaz's job duties which were ultimately reclassified into a GL 23 position. According to Walthall, the GL 23 position fit "perfectly" with the duties Boaz was performing. Concurrently, the Compensation Department and HR also conducted an evaluation of Boaz herself to ensure she met the minimum specifications for the GL 23 position.

Walthall's testimony regarding changes in her own department is illustrative of the changes that were happening across FedEx. Walthall testified that as a result of the reorganization her own department shrank from twenty to five employees whose positions were realigned to perform the duties or the original twenty employees. Walthall was selected to remain in the Compensation Department she signed an offer letter

for the same GL 26 position that she previously held, and her new job duties included those of two other employees who left the department, one of whom was a GL 27 employee.

The court finds that FedEx reclassified the print and archive vendor liaison duties and that the reclassification led to the wage differential between Boaz and Terrell. Further, the court also finds that the reclassification of the print and archive vendor liaison duties was the result of a legitimate business reason to reduce redundancies in staffing and processes, and that the reclassification was not "illusionary" or a "post-event justification" for paying Boaz less than Terrell.[14]

c.  Gender Neutral Classification and Application

The next issue is whether the job classification system that FedEx used to reclassify the print and archive vendor liaison duties was gender-neutral on its face and application. *See Timmer*, 104 F.3d at 844-45 (stating that the factor other than sex must not be "based on considerations of sex and [must] not [be] discriminatory in application"); *see also Wash. Cnty.*,

---

[14]In addition, there was evidence at trial that the GL 27 PMA position was overutilized and that Terrell's job duties were overgraded. The Sixth Circuit has recognized that a wage disparity due to a mistake in the application of the job classification system is a defense within the fourth exception of the EPA. *Timmer*, 104 F.3d at 843-44. Although FedEx did not explicitly argue that a mistake in classifying Terrell's job duties was the reason for the wage disparity, the evidence presented at trial supports such a conclusion.

452 U.S. at 170 ("Equal Pay Act litigation, therefore, has been structured to permit employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of 'other factors other than sex.'"); *Corning Glass*, 417 U.S. at 201 (stating that the factors "used to measure the relationships between jobs and which establish a valid basis for a difference in pay," must not discriminate on the basis of sex); *Little*, 2006 WL 839401, at *4 ("To qualify as a bona fide job classification system, the system must be gender neutral on its face and in its application."); *Welde v. Tetley, Inc.*, 864 F. Supp. 440, 457 (M.D. Penn. 1994)(finding that the defendant met its burden of showing that any differential in pay was attributable to a factor other than sex because its method of establishing corporate salaries was gender-neutral); *Cayce v. Adams*, 439 F. Supp. 606, 608 (D.D.C. 1977)("[H]owever 'bona fide' the [] classification system appears on paper, if it is not applied in a sex-blind manner, differences are not entitled to exemption from the operation of the Equal Pay Act. A classification system reflecting differences based on sex, whether as drafted or as applied, cannot be bona fide."). Put another way, the reclassification of the print and archive vendor liaison job duties, while adopted for a legitimate business reason, must be a gender-neutral process and cannot be

applied discriminatorily to deny Boaz of equal pay because of her sex.

Walthall testified that when a manager needed a position to perform particular duties in her department, the manager would provide a job description to the Compensation Department, which in turn would evaluate the particular job duties and provide the manager with the appropriate position. In the instant case, Burns provided Walthall with Boaz's job duties and Walthall determined that they fit "perfectly" the GL 23 position. Additionally, Walthall also evaluated Boaz's job duties in the context of a GL 26 and GL 27 position and determined that Boaz did not perform the high-level duties required by those positions. The job descriptions for each of these positions are gender-neutral. (*See* Trial Exs. 55, 56.) Only the print and archive vendor liaison job duties were discussed and evaluated, and the fact that Boaz was female was not considered by Walthall in making the determination that Boaz was not performing the GL 26 and GL 27 job descriptions.

The GL 23 position description specifies what knowledge, skills, and abilities are required to occupy that position. The GL 23 position requires: (1) a bachelor's degree or equivalent; (2) two years exempt experience in the administration and/or development of quality processes or technical support of the design, development, and operation of information systems; (3)

57

working knowledge of computerized inventory and quality control systems; and (4) strong analytical, human relations and communication skills. (*See* Trial Ex. 56.) "Prior experience and education are factors that an employer may utilize in determining whether to pay any applicant more than other employees in the same job." *Hatton v. Univ. of Tenn.*, 780 F. Supp. 1157, 1166 (W.D. TN 1991). These qualification requirements are clearly gender-neutral, and the evidence is convincing that these factors, as opposed to Boaz's gender, were the second reason that her salary was lower than her predecessor's. The court therefore finds that FedEx's pay classification system was gender neutral on its face and in application.

There was extensive testimony at trial that Boaz's job duties and qualifications were evaluated more than once and it was determined that they did not match a GL 25, 26 or 27 position. Besides Boaz's subjective belief that her job duties amounted to a higher level position, there was no other indication that FedEx erred in classifying her job duties. As Walthall testified, FedEx's job descriptions are stated in general terms and have room for flexibility. Any variance between the work Boaz performed and the GL 23 job description appears to fit into this flexible area. *See Welde*, 864 F. Supp. at 457 (finding that the job description matched the plaintiff's

duties because the job description was "vague, with some room for flexibility and practical adaptation [and] [a]ny variance between the job description and the work performed by plaintiff . . . appear[ed] to fit comfortably into this flexible area.").

Similarly, although Boaz presented evidence that she met the minimum job qualifications for the GL 27, 26 and 25 positions, the testimony at trial showed that Mennis engaged in a thorough analysis of Boaz's qualifications following established protocol and refraining from using gender as a factor in arriving at her decision. The court need not determine whether Mennis had a duty to engage in further investigation of Boaz's degree and experience qualifications in order to determine whether Boaz met the minimum qualifications for the GL 25, 26, and 27 positions. It is sufficient that Mennis used gender-neutral factors in making the determination. Having determined that that FedEx used and applied a gender-neutral job classification system and gender-neutral job qualifications, the court will not substitute its judgment for that of FedEx.

d.   Reasonable Use of a Factor Other than Sex

It is undisputed that FedEx did not immediately reclassify Boaz's job duties and, for approximately one year, it allowed her to perform duties outside her pay grade. The Sixth Circuit requires that the factor offered by FedEx — the reclassification

59

of the position — be used "reasonably in light of the employer's stated purpose." *J.C. Penney Co.*, 843 F.2d at 253; *see also Kienzle v. Gen. Motors, LLC*, 903 F. Supp. 2d 532, 547 (E.D. Mich. 2012)(requiring the defendant to justify its delay in curing the wage disparity between the plaintiff and other male employees performing equal work). Other courts have held that once the employer becomes aware that the employee was performing work equal to a higher pay employee, it is "required to act within a reasonable time" to remedy the situation. *E.E.O.C. v. Maricopa Cnty. Cmty. Coll. Dist.*, 736 F.2d 510, 515 (9th Cir. 1984); *see also Molden v. United States*, 11 Cl. Ct. 604, 613 (1987)(holding that five years of efforts to reclassify plaintiff's job was an unreasonable amount of time); *Cayce v. Adams*, 439 F. Supp. 606, 609 (D.D.C. 1977)("There was a knowing failure to pursue a classification investigation designed to put male and female employees doing 'equal work' on an equal footing consistent with classification standards."). Thus, once FedEx became aware that Boaz was performing work equivalent to Terrell but with lower pay, it was required to reclassify Boaz's job duties within a reasonable time in light of FedEx's large-scale reorganization.

The Ninth Circuit case of *E.E.O.C. v. Maricopa County Community College District*, 736 F.2d 510 (9th Cir. 1984), is somewhat similar to the case at bar in that it involved a female

loan clerk who began performing higher level work that would place her in a higher paid job classification. *Id.* at 511-12. The female loan clerk sought a promotion but was not reclassified for almost two years. *Id.* at 512. The defendant employer argued that a factor other than sex accounted for the wage disparity because its job classification system and a freeze on position reevaluations had produced the wage disparity. *Id.* at 514. The court stated:

> No employer can be expected [] to effect an immediate reclassification. It must be allowed a reasonable time to evaluate the position and the employee to see if reclassification is warranted. Also, the employer should be allowed to determine whether its organizational needs are such that an employee filling the higher position is necessary. If not, it may require the employee to stop working beyond his or her present job classification, as long as the decision to take that course is not made on account of the employee's sex.

> Here, however, the employer chose neither of those courses. Once it became aware that [the female loan clerk] was performing work equivalent to the male financial aid assistants, but with lower pay, it was required to act within a reasonable time. Instead of requiring [the female loan clerk] to work within her student loan clerk classification, it permitted her to continue working in the equivalent of the financial aid assistant position for almost two years before taking any action. And, when it did reclassify her, it did not give her back pay or retroactive seniority.

*Id.* at 515 (citations omitted).

In *Molden v. United States*, 11 Cl. Ct. 604 (1987), another similar case, female employees employed at a GS-11 pay grade alleged that male employees performing equal jobs were being

compensated at the GS-12 and GS-13 pay grades. *Id.* at 606. The defendant employer asserted that any wage disparities were due to the implementation of new job classification standards, which was necessitated after the defendant had discovered serious problems of overgrading. *Id.* at 607. The defendant employer had instituted a freeze on all promotions until the overgrading problem was corrected. *Id.* Despite evidence that problems arose in the implementation of the new standard delaying the process, the court found a violation of the EPA, stating:

> It was the responsible official's inability to correct the wage discrepancies in a timely manner that removed defendant's job classification from it's [sic] otherwise bona fide status, and gave rise to the violation of the Equal Pay Act. The existence of the wage disparities, along with the fact that the disparities were known to the responsible officials, and the fact that the discrepancies have not been remedied, removes the bona fide status from the defendant's job classification system.
> . . . .
> [F]ive years of administrative efforts to rectify seven years of wage discrimination in the present case [was] an unreasonable amount of time. By utilizing the plaintiffs to do the work which their co-workers at the GS-12 level were doing, the defendant benefit[ed] from the acquired knowledge and expertise of the plaintiffs while not fairly compensating them at a level equal to that of their male co-workers.

*Id.* at 613. The court also noted that despite the defendant employer's claim that wage disparities were attributed to the implementation of the new classification standards and the temporary promotion freeze, three male co-workers of the plaintiffs were promoted to the GS-12 level. *Id.* at 607.

In *Kienzle v. Gen. Motors, LLC*, 903 F. Supp. 2d 532 (E.D. Mich. 2012), the plaintiff alleged that she performed full-time work while receiving a salary based on a part-time work week. *Id.* at 536.   The plaintiff claimed that the defendant employer was aware that she was performing equal work to several male supervisors.   Nevertheless, the defendant employer "delayed for seven months her requests to be upgraded to full-time status to reflect her actual workload."   *Id.*   The defendant employer argued that it did not upgrade plaintiff to a full-time position because "of staffing and headcount limitations resulting from budgetary constraints."   *Id.* at 539.   The *Kienzle* court denied defendant's motion for summary judgment on the EPA claim stating that "[a] fact question remains on the issue whether [the defendant's] delay in converting [plaintiff] to full-time status following her several requests was justified by economic pressures."   *Id.* at 547.

The facts in the present case do not indicate such an unreasonable implementation of the reclassification process as to give rise to an EPA violation.   It is undisputed that FedEx did not evaluate the print and archive vendor liaison position before Terrell left the company or immediately after Boaz took over Terrell's duties in February of 2004.   However, FedEx cannot be expected to have effected an immediate reclassification of Boaz's job responsibilities and was allowed

63

a reasonable time to evaluate the position as well as Boaz to see if reclassification was warranted.   In June/July 2004, within four months, the Compensation Department evaluated Boaz's duties and her qualifications for the first time.   Although compensation did not classify Boaz's duties at this time, it did determine that they did not fit a GL 26 position.   The facts in this case do not support a knowing failure to pursue a classification investigation.

Walthall acknowledged that Boaz was performing duties outside of her GL 7 pay grade from February 2004 until December 2004, at which time FedEx rectified the situation by providing Boaz with an interim GL 25 position while the Compensation Department finished reviewing Burn's organization.[15]   Unlike the employees in *Maricopa County* and *Molden*, who were allowed to do work beyond their present job classification for two and five years respectively, Boaz was allowed to perform work beyond her

---

[15]The Engelman investigation arrived at the same conclusion. That report states:

> It was not management's intent to keep Boaz in her nonexempt quality assistant position long term but to place her and several non exempt coworkers in exempt positions assigned to the Quality department post I-Service or to place them in new positions in a Quality career progression.
> Clearly, Burns failed to work with human resources and compensation on the front-end to ensure that Boaz was in job and pay classifications consistent with the work she was performing and pay administration guidelines for permanent nonexempt salaried employees.

(Engelman Report 11, Trial Ex. 25.)

GL 7 classification for less than one year.  Furthermore, although Boaz was not paid retroactively, she was given special assignment credit for her work from December 2003 until April 2005.  *Cf. Maricopa Cnty.*, 736 F.2d at 515 (holding that EPA was violated because the defendant did not compensate plaintiff with neither "back pay or retroactive seniority").  Lastly, while in *Molden* there was evidence of sexual discrimination in the application of the promotion freeze, in the present case there is no evidence that FedEx's reclassification system was not properly implemented.

Boaz's job duties were ultimately reclassified into a GL 23 Quality Assurance Systems Support Analyst position in May 2005.  Boaz's compensation in the GL 23 position remained the same as the GL 25 which she was awarded in December 2004.  The testimony is clear that Walthall and Burns were in constant communication trying to determine the appropriate classification for Boaz's job duties.  Furthermore, Walthall testified that the reclassification was a labor intensive process and she was doing the best she could to complete implementation of phase three of the I-Service reorganization.

The court finds that FedEx acted reasonably in reclassifying Boaz's position.  The delay in the present case was not so unreasonable as to constitute a violation of the EPA.  Even if FedEx's conduct was so unreasonable as to constitute an

EPA violation, such illegal conduct ended either on December 1, 2004, the date that Boaz was placed in a GL 25 Quality Administrator position, or May 18, 2005, the date that Boaz received a job offer in her newly classified GL 23 Quality Assurance Systems Support Analyst position. In order to trigger the protections of the EPA, Boaz must have filed her complaint no more than two years after the date of the alleged violation or within three years in the case of a willful violation. 29 U.S.C. § 255(a). Boaz filed her complaint on April 17, 2009. Applying the three-year statute of limitations, Boaz's allegations of FLSA violations prior to April 17, 2006 are untimely, and by December 2004, FedEx had placed Boaz in a GL 25 position.

    3.   *Pretext*

Because FedEx has proven its affirmative defense, Boaz has a burden of production to demonstrate that FedEx's reasons for the pay differential were pretextual. *Buntin*, 134 F.3d at 799 n.7. "Although intent to discriminate is not a requisite element for making out an EPA claim, a showing of discriminatory motivation may be used to demonstrate that an affirmative defense on which the employer relies is in fact pretextual." *Welde*, 864 F. Supp. at 442 (citing *E.E.O.C. v. Del. Dept. of Health and Soc. Servs.,* 865 F.2d 1408, 1414 n.8 (3d Cir. 1989)).

Boaz has not demonstrated that FedEx's reasons for the pay disparity were pretextual.[16]    As stated above, FedEx had a legitimate business need to reorganize its staff and processes as well as limit utilization of the GL 27 PMA position.  While the "fact or timing of an employer reorganization" merit scrutiny, *see Patkus*, 769 F.2d at 1261, no evidence was offered to show that the reclassification of Boaz's job responsibilities was a pretext or a "post-event justification for a gender-based pay differential."  *Little*, 2006 WL 839401, at *6; *see also Odomes*, 653 F.2d at 251-52 (stating an "illusory" and "post-event" justification for unequal pay was not a valid "factor other than sex").  Boaz was not singularly affected by this reclassification.  The testimony at trial reflects that as the result of the reclassification many FedEx employees experienced an increase in their duties, a decrease in pay grades, or termination of their position.  As Walthall testified, had Terrell remained, he would have faced one of these options.  *See Patkus,* 769 F.2d at 1261 (stating that the reclassification was legitimate because there was nothing to indicate that had the plaintiff remained in the position, she would not have been subject to the reclassification).

---

[16]At trial, Boaz maintained that it did not need to prove that FedEx's reasons were pretextual because FedEx had not carried its burden of proving its "factor other than sex" defense.

Further, Boaz presented no evidence that gender considerations played any role in the decision to classify Boaz's job duties into the GL 23 position instead of a higher graded position. The evidence of other females with PMA positions, including Boaz's replacement, refutes the fact that gender played any role in FedEx's classification of a job or its evaluation of whether an employee meets the minimum specifications for a position. *See Molden*, 11 Cl. Ct. at 611 (finding that although the job classification system as it was designed was gender-neutral, only the female plaintiffs were affected in a discriminatory manner).

Boaz also argued that FedEx's failure to compare Boaz's job duties with Terrell's job duties indicates a discriminatory application of the job classification system. However, in light of its reorganization, FedEx was not required to compare Boaz's job position to that of Terrell's. All that the EPA requires is that the pay classification system be based on gender-neutral factors. *See Little*, 2006 WL 839401, at *5. ("Plaintiff[s] ha[ve] presented no case law or evidence to support the proposition that [d]efendant's failure to compare [p]laintiffs['] classification to those of the putative supervisory comparators indicates that the classification system was discriminatorily applied." (internal quotation marks omitted)).

68

The court therefore finds that although Boaz was paid less for performing equal work as her predecessor, the pay disparity was due to a factor other than sex. FedEx has proved that its reclassification system was a gender-neutral process that arose out of legitimate business necessity. Because the court finds that the pay disparity between Boaz and Terrell was the result of a factor other than sex, the court need not decide whether the disparity was caused by negligent or willful conduct on the part of FedEx.

B.   Boaz's Overtime Compensation Claim, 29 U.S.C. § 207(a)

The FLSA requires that the employer compensate employees for any hours worked in excess of forty hours per week at a rate of at least one and a half times her normal rate of pay. 29 U.S.C. § 207(a)(1). "On call" time may be considered as time worked for purposes of calculating overtime compensation in circumstances when the "employee's free time [is] severely restricted." *Aiken v. City of Memphis*, 190 F.3d 753, 760 (6th Cir. 1999)(citation and internal quotation marks omitted). An employee is exempt from receiving overtime compensation if she is employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1). As previously stated, in order to trigger the protections of the FLSA, Boaz must have filed her complaint no more than two years after the

date of the alleged violation, or within three years in the case
of a willful violation.   29 U.S.C. § 255(a).

The first issue is the timeliness of Boaz's claim for
overtime compensation under the FLSA.   Boaz filed this lawsuit
on April 17, 2009.   After she filed her first Open Door
complaint, Boaz was given the option to submit time for
oncall/recall compensation per FedEx Policy 3-44 or continue to
flex her schedule.   (Trial Ex. 23.)   Thus, Boaz was allowed to
submit time for oncall/recall compensation between June 1, 2007
and June 15, 2008.   Applying the three-year statute of
limitations, Boaz's FLSA claim for overtime compensation would
span from April 17, 2006 until June 1, 2007.   Alternatively,
applying the two-year statute of limitation, Boaz's FLSA claim
for overtime compensation would span from April 17, 2007 until
June 1, 2007.

Although there is evidence in the record that from February
1, 2004 until November 30, 2004, Boaz was classified as a
nonexempt employee but not paid overtime compensation as
required by the FLSA, this period is more than three years
before Boaz commenced her FLSA action and therefore barred by
the statute of limitations.   *See Archer v. Sullivan Cnty.,
Tenn.*, 129 F.3d 1263, at *2 (6th Cir. 1997)("A cause of action
is deemed to accrue, as a general rule, at each regular payday
immediately following the work period during which the services

70

were rendered for which the wage or overtime compensation is claimed." (citation and internal quotation marks omitted)). Boaz did not otherwise argue that the doctrine of equitable tolling should be applied in this case

Within the statute of limitations period, Boaz was classified by FedEx as a GL 23 exempt employee. The issue thus becomes whether FedEx properly classified Boaz as an exempt employee to whom the FLSA overtime provision did not apply. The regulations provide that the administrative exception to FLSA's overtime compensation requirement covers employees that are:

> (1)  Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;"
>
> (2)  Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3)  Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a); *see also Foster v. Nationwide Mu. Ins. Co.*, 710 F.3d 640, 642 (6th Cir. 2013)(citing FLSA regulations). The defendant bears the burden of proving by a preponderance of the evidence that the employee was, in fact, administratively exempt. *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 575-77 (6th Cir. 2007).

71

"An employee's subjective belief that her position was exempt from the FLSA [] does not mean the position was exempt as a matter of law." *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 607 (6th Cir. 2013)(citation omitted).  A job title alone is insufficient to establish the exempt status of an employee.  29 C.F.R. § 541.2.  Rather, an analysis of the employee's exempt status should be determined on the basis of the employee's actual salary and primary duties.  *Id.*  The primary duty is "the principal, main, major or most important duty that the employee performs," and its determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).

As to the third factor, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202.  In determining whether an employee exercises discretion and independent judgment with respect to matters of significance, the court considers the following factors:

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to

operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b). FLSA regulations clarify that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c). The exercise of discretion and independent judgement does not require that the decisions made by Boaz "have a finality that goes with unlimited authority and a complete absence of review." *Id.* "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* § 541.202(a).

In *Shay v. Dura Automotive Systems, Inc.*, No. 1:08-0046, 2009 WL 2996474 (M.D. Tenn. Sept. 16, 2009), the plaintiff's basic function was "to plan and schedule the releases of purchased parts to ensure that production schedules were maintained." *Id.* at *2. The plaintiff had to "keep a line of communication open with both suppliers and people within the company," and her primary role was to solve any problems arising

in production.  *Id.* (internal quotations omitted).  Plaintiff
stated that "as far as her day-to-day work, the majority of how
to organize, plan and do her job was her decision [, and] [s]he
agreed that her job was basically problem solving."  *Id.*  On the
other hand, the plaintiff did not have authority to negotiate
prices, no one reported to her, and she had no authority to
discipline another employee.  *Id.* at *3.  Further, the plaintiff
was not involved in the general management of the plant but only
in the operation of a single production line.  *Id.*  The court
found that plaintiff exercised independent judgment because "she
solved various problems for the company; [] she used her own
discretion in doing her job; and [] she had to react to changes
and 'work on the fly' to some extent."  *Id.*

Boaz satisfies that first requirement of the administrative
exception to the FLSA.  As a GL 23 employee, Boaz was paid at a
monthly salary of $4180.00. (Trial Ex. 28.)

Boaz satisfies the second requirement.  Boaz's primary duty
was the performance of office work directly related to FedEx's
general business operations or its customers.  Boaz was the
liaison between FedEx and its vendors.  She was responsible for
ensuring that the correct information got to the print and
archive vendors so that FedEx could get its invoices out
correctly and timely, and so that FedEx would be paid.  On
cross-examination, Boaz testified that if the invoices were not

correct or if they went out late, it impacted FedEx's revenue stream.  Moreover, Boaz worked as a GL 23 Quality Assurance Systems Support Analyst in the Quality Performance Management department, and such work is explicitly contemplated by the regulations as work directly related to management or general business operations.  29 C.F.R. § 541.201(b).

As to the third requirement, the preponderance of evidence establishes that Boaz could exercise discretion and independent judgment with respect to matters of significance.  On one hand, Boaz did not manage employees, did not have authority to hire or fire, could not establish or deviate from FedEx policies, could not establish budgets, could not bind FedEx contractually, and was not involved in long term business planning on behalf of FedEx.  On the other hand, Boaz implemented operating practices, carried out major assignments in conducting the operations of the business, performed work that affected business operations to a substantial degree, provided consultation and expert advice to management, resolved matters of significance, and had discretion to carry her day-to-day functions.

Boaz's primary duties included overseeing and troubleshooting failures in file transfer and acting as a liaison between the vendor and the business manager to resolve the problem.  Boaz coordinated projects; she oversaw file transfers; if a file failed in transmission, she researched and

corrected the issue; she used her experience, judgment and discretion to get the right people on a conference call and acted as a liaison between the print vendor and FedEx until the issue was resolved; and, if the issue involved implementation, it was her duty to be an implementation person. These activities comprised Boaz's primary job duties, and Boaz did not require prior approval from Burns in conducting these activities. Boaz worked without "constant supervision, and [her] assignments [were] not doled out step-by-step by [Burns]." *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 574 (6th Cir. 2007).

In addition, Boaz was the subject-matter expert in the print and archive vendor liaison function and supported multiple projects while acting as a minor lead in the part of the project she supported. According to Boaz's own testimony, she worked on complex projects and she was lead for her part of the project. Boaz's work affected business operations to a substantial degree even though her assignments were related to the operation of a particular segment of the business. Boaz testified that her job impacted FedEx's revenue stream. Boaz also provided consultation or expert advice to management. She made recommendations to management about aspects of her job, new developments, and changes to her job.

In an affidavit that Boaz submitted to the court, she lists multiple projects she implemented and various presentations she made to management.  (Trial Ex. 32.)   In this affidavit, Boaz asserts that she proposed and implemented (along with the vendors and FedEx Networking Architecture) the InfoSec project, designed to save FedEx approximately $16,000 in data transmission costs.  (*Id.*)   Boaz's own affidavit and her testimony at trial reflect that she used her skill, experience, judgment, and discretion in troubleshooting problems, finding a solution, and presenting expert advice and recommendations to management which resulted in lower operating costs.  Similar to the plaintiff in *Shay*, Boaz "solved various problems for the company," and to some extent reacted to problems "on the fly." *Shay*, 2009 WL 2996474, at *3; *see generally Foster*, 710 F.3d at 646-50.  Boaz herself developed various manuals and standard operating procedures to document her responsibilities as a print and archive vendor liaison.  (Trial Exs. 12-15.)  Accordingly, the court finds that FedEx has carried its burden of establishing that Boaz was an exempt employee under the FLSA.

Boaz argues that by allowing her to flex her schedule or submit time for oncall/recall compensation after June 1, 2007 pursuant to FedEx Policy 3-44, FedEx acknowledged she was not an exempt employee under the FLSA.  The flaw with this argument is that FedEx "Exempt Standby/On-call Compensation" Policy 3-44 by

its terms applies to exempt employees who work in critical areas and it is not strictly an overtime compensation policy. FedEx policy 3-44 provides that "[f]ull-time employees are granted 1 hour of compensatory time for every 8 'duty' hours on standby," and that if "compensatory time off cannot be scheduled because of business conditions, employees can receive a lump sum payment for the compensatory time earned, with approval by the managing director." (See Trial Ex. 24.)    FedEx's obligation under the FLSA is to compensate nonexempt employees for overtime work. FedEx is not legally obligated under the FLSA to compensate exempt employees for overtime work.    Thus, although FedEx allowed Boaz to flex her schedule or submit time for oncall/recall compensation after June 1, 2007, FedEx's failure to apply its own policy retroactively does not constitute a violation of the FLSA.  The pertinent issue is whether Boaz was properly classified as an exempt employee under the FLSA and not whether FedEx appropriately applied its own policy.[17]    Having found that Boaz was exempt under the FLSA, FedEx was under no obligation to compensate Boaz for overtime.

Because the court finds that Boaz was properly classified as an exempt employee under the administrative exemption to the

---

[17]The Engelman Report concluded that Boaz should have received retroactive compensation for overtime hours pursuant to FedEx policy 3-44. It did not conclude that FedEx was under a legal obligation to compensate Boaz for past overtime work. (See Trial Ex. 25.)

FLSA during the statute of limitations period, the court need not decide whether FedEx acted negligently or willfully or whether Boaz has met her burden of proving that she worked hours which entitled her to overtime compensation under the FLSA.

### IV. CONCLUSION

Based on the foregoing, the court finds that FedEx did not violate the EPA or the FLSA's overtime compensation provision. Boaz shall recover nothing from FedEx, this case is dismissed with prejudice, and the Clerk is directed to enter judgment for FedEx.

IT IS SO ORDERED this 22nd day of May, 2015.

s/Diane K. Vescovo_____
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE